No. A–172. LENHARD ET AL., CLARK COUNTY DEPUTY PUBLIC DEFENDERS, INDIVIDUALLY AND AS NEXT FRIENDS OF BISHOP *v.* WOLFF, WARDEN, ET AL. C. A. 9th Cir. Applica-

tion for stay of execution of sentence of death, presented to Mr. Justice Rehnquist, and by him stayed to and including October 1, 1979, and referred to the Court, denied.

Mr. Justice Marshall, with whom Mr. Justice Brennan joins, dissenting.

I continue to adhere to my view that the death penalty is unconstitutional in all circumstances. Accordingly, I dissent. In addition, however, I feel compelled to note that the present decision is indefensible even under the more restrictive view of the Eighth Amendment taken by a majority of my Brethren. For today the Court grants a man's wish to be put to death even though the sentencing hearing accorded to him failed to comply with the procedural requirements imposed by the prior decisions of this Court.

I

Since there is no opinion accompanying the denial of the requested stay, a brief review of the events leading up to this application is necessary.

While in the process of robbing a cashier at a Las Vegas casino, Jesse Walter Bishop shot an employee and a patron of the casino who tried to prevent the crime. The patron died as a result of the wound. Bishop was charged with nine felony counts, including first-degree murder.

At the January 13, 1978, arraignment, Bishop stated that he wished to represent himself, to discharge the public defenders assigned to him, and to plead guilty to all charges. On January 23, 1978, after hearing testimony from three court-appointed psychiatrists, the trial judge found Bishop to be competent. The judge informed Bishop that the maximum sentence for first-degree murder was death and suggested that *pro se* representation was ill-advised. Nevertheless, Bishop insisted on discharging the public defenders. Relying on *Faretta* v. *California,* 422 U. S. 806 (1975), the judge granted Bishop's motion for self-representation. The judge did ap-

point the public defenders as "standby counsel," however, and informed Bishop that he could confer with them if he wished.

Bishop pleaded guilty to all counts. At the sentencing hearing before a three-judge panel, the State presented evidence of aggravating circumstances. Bishop introduced no evidence in mitigation. Standby counsel sought to present evidence of mitigating circumstances. Bishop, however, refused to agree to the admission of any such evidence. The court acceded to his wishes and did not allow standby counsel to proceed. Finding the existence of aggravating circumstances and noting that Bishop had offered no proof of mitigating circumstances, the court imposed the death penalty.

Bishop initially allowed the public defenders to prosecute an appeal to the Nevada Supreme Court. After the appeal had been filed, however, Bishop sought to have the appeal dismissed and apparently informed the justices of the Nevada court that he wanted to be executed. The court ignored the *pro se* effort, reached the issues raised by the public defenders, and affirmed. The court reasoned that, under *Faretta,* Bishop had the absolute right to represent himself and to decline to introduce any mitigating evidence at the sentencing phase of the capital trial. The court further held that the Nevada death penalty statutes were constitutional because they were similar to the Florida statutes upheld by this Court in *Proffitt* v. *Florida,* 428 U. S. 242 (1976).[1]

---

[1] Justice Manoukian dissented from the Nevada Supreme Court decision. He argued that a self-represented defendant has no right under *Faretta* to waive his right to present mitigating evidence at the sentencing phase of his trial. The sentencing court's refusal to allow the public defenders to present such evidence, he asserted, constituted state-sanctioned suicide. Furthermore, he contended, society has an overriding Eighth Amendment interest in ensuring that capital punishment is imposed only in appropriate cases. That interest would go unsatisfied in a case such as this, where the sentencer is not presented with all available mitigating evidence and therefore cannot make a rational decision as to the propriety of imposing the death penalty.

On August 1, 1979, the state trial court relieved the public defenders of any further responsibility as Bishop's counsel. Nonetheless, referring to their moral and ethical obligations, they filed this federal habeas corpus petition against Bishop's wishes on August 16.   On August 18, at the State's request, Bishop submitted to a psychiatric examination.   After a 4-hour interview, the psychiatrist determined that Bishop was competent to waive further litigation.   This psychiatric evidence was presented to the Federal District Court by affidavit. Bishop refused the public defenders' request to submit himself to a psychiatrist of their choosing.   On August 23, Bishop appeared before the District Court and stated that he did not wish to pursue any further litigation.   On the same date, the District Court denied the writ, holding that Bishop had made a valid waiver of his right to pursue federal relief and that therefore the public defenders had no standing to bring this action under *Gilmore* v. *Utah*, 429 U. S. 1012 (1976).   On August 24, the Court of Appeals for the Ninth Circuit affirmed.

On August 25, however, Bishop voluntarily appeared before the Nevada Board of Pardons.   He told the Board that he would be willing to accept commutation of his sentence to life imprisonment if the Board saw fit to do so.   The Board denied commutation by a 5–2 vote.

II

The majority of this Court assumes that Bishop's conduct waives the possibility of a challenge to his execution.   In my judgment, however, there can be no such waiver.   In *Gilmore* v. *Utah, supra,* at 1018.   MR. JUSTICE WHITE, in a dissenting opinion in which MR. JUSTICE BRENNAN and I joined, asserted "that the consent of a convicted defendant in a criminal case does not privilege a State to impose a punishment otherwise forbidden by the Eighth Amendment."   In my own dissenting opinion, I expressed the view that "the Eighth Amendment not only protects the right of individuals not to be victims of cruel and unusual punishment, but that

it also expresses a fundamental interest of society in ensuring that state authority is not used to administer barbaric punishments." 429 U. S., at 1019.

Society's independent stake in enforcement of the Eighth Amendment's prohibition against cruel and unusual punishment cannot be overridden by a defendant's purported waiver.[2] By refusing to pursue his Eighth Amendment claim,[3] Bishop

---

[2] Bishop's "competency" to make such a waiver is by no means self-evident to me. He has been a drug addict for a number of years and is presently taking a large daily dosage of tranquilizers. In addition, three factors have combined to put Bishop under extreme stress. First, while making an appearance before the state trial court, Bishop complained bitterly of allegedly inhumane conditions in the Nevada state prison and stated that he would rather die than remain incarcerated. Second, apparently because he is convinced that no legal efforts could result in the vacating of his death sentence, Bishop desires his execution to occur swiftly, so that his family will suffer for the shortest possible period. This concern is the evident motivation behind Bishop's decision to forgo federal habeas corpus proceedings, which he believes would result at most in one or more agonizing stays of execution before the death sentence is finally carried out. Third, Bishop's testimony before the Nevada Board of Pardons reveals that he considers it undignified to ask for mercy. Indeed, he stated that he had refused to take the stand at the sentencing phase of his trial and to allow any member of his family to do so because, in his view, such testimony would have constituted begging for pity for him.

[3] In addition, of course, the majority considers Bishop's conduct as waiving any challenge to the constitutionality of the Nevada statutes under which he was sentenced to death. Not only have these statutes never been reviewed by this Court, it appears that the Court has never before been asked to review a death sentence imposed under them. An execution should not be allowed to proceed until this Court has had the opportunity to review the constitutionality of the statutes under which the sentence of death was imposed. Cf. *Gilmore* v. *Utah*, 429 U. S. 1012, 1017 (1976) (WHITE, J., joined by BRENNAN and MARSHALL, JJ., dissenting); *id.*, at 1019 (MARSHALL, J., dissenting). The Supreme Court of Nevada upheld these statutes because of their supposed similarity to the Florida death penalty statutes upheld in *Proffitt* v. *Florida*, 428 U. S. 242 (1976). To the extent that the Nevada provisions do resemble those Florida statutes, I would strike them down not only because I believe that

has, in effect, sought the State's assistance in committing suicide. Society is not powerless, however, to resist a defendant's effort to prompt the exercise of capital force. As the Supreme Court of Pennsylvania has eloquently recognized in a similar case:

> "The doctrine of waiver developed not only out of a sense of fairness to an opposing party but also as a means of promoting jurisprudential efficiency by avoiding appellate court determinations of issues which the appealing party had failed to preserve. It was not, however, designed to block giving effect to a strong public interest, which itself is a jurisprudential concern. It is evident from the record that [the convicted defendant sentenced to death] personally prefers death to spending the remainder of his life in prison. While this may be a genuine conviction on his part, the waiver concept was never intended as a means of allowing a criminal defendant to choose his own sentence. . . . The waiver rule cannot be exalted to a position so lofty as to require this Court to blind itself to the real issue—the propriety of allowing the state to conduct an illegal execution of a citizen." *Commonwealth* v. *McKenna,* 476 Pa. 428, 441, 383 A. 2d 174, 181 (1978).

Bishop's diligent and conscientious attorneys, who were appointed at trial to represent his interests, are quite capable of litigating the Eighth Amendment questions involved in this case. There is no indication that they would be less vigorous or able advocates than was Gilmore's mother. Cf. *Gilmore* v. *Utah,* 429 U. S., at 1018 (WHITE, J., dissenting); *id.,* at 1020 (BLACKMUN, J., dissenting).

---

capital punishment is unconstitutional in all circumstances, but also because in my view the Florida statutes have led to the arbitrary and capricious imposition of capital punishment. See *Gardner* v. *Florida,* 430 U. S. 349, 365–370 (1977) (MARSHALL, J., dissenting).

## III

Moreover, the procedures in this case did not even comply with the requirements developed by the joint opinion in *Gregg* v. *Georgia,* 428 U. S. 153 (1976), and its progeny. In 1976, the Court held that capital punishment is not unconstitutional in all circumstances. *Gregg, supra; Proffitt* v. *Florida,* 428 U. S. 242; *Jurek* v. *Texas,* 428 U. S. 262; *Woodson* v. *North Carolina,* 428 U. S. 280. Because "the penalty of death is qualitatively different from a sentence of imprisonment, however long," *Woodson* v. *North Carolina, supra,* at 305 (opinion of STEWART, POWELL, and STEVENS, JJ.), these decisions require sentencing procedures that are carefully designed to ensure that the death penalty will not "be inflicted in an arbitrary and capricious manner," *Gregg* v. *Georgia, supra,* at 188 (opinion of STEWART, POWELL, and STEVENS, JJ.). The Court approved a bifurcated proceeding in capital cases in which, after a guilty verdict has been reached, a sentencing hearing is held in which the State may present evidence of statutorily provided aggravating circumstances and the defendant may present evidence in mitigation. In the sentencing hearing, the sentencing authority must consider the "character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death," *Woodson,* 428 U. S., at 304, to ensure that "death is the appropriate punishment in a specific case," *id.,* at 305. See *Roberts (Harry)* v. *Louisiana,* 431 U. S. 633, 637 (1977); *Jurek* v. *Texas, supra,* at 271–272.

Indeed, in one of its most recent decisions on the issue, a plurality of this Court focused on the constitutional importance of individualized sentencing in capital cases. *Lockett* v. *Ohio,* 438 U. S. 586, 602–605 (1978) (opinion of BURGER, C. J., joined by STEWART, POWELL, and STEVENS, JJ.). The plurality noted this Court's earlier pronouncement that the sentencing authority's " 'possession of the fullest information pos-

sible concerning the defendant's life and characteristics' is '[h]ighly relevant—*if not essential*—[to the] selection of an appropriate sentence. . . .' " *Id.*, at 603 (quoting *Williams* v. *New York*, 337 U. S. 241, 247 (1949)) (emphasis in *Lockett*). The plurality then concluded:

> "Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases. The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases. . . . The nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence." 438 U. S., at 605.

This need for individualized consideration of the capital defendant led the plurality to conclude that "a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." *Ibid.* As a result, the plurality stated that a death penalty statute that "preclude[s] consideration of relevant mitigating factors" violates the Eighth Amendment. *Id.*, at 608.[4]

In the present case, the defendant Bishop, acting as his own defense counsel, failed to introduce any mitigating evidence at

---

[4] I concurred in the result in *Lockett*, reiterating my view that the death penalty is under all circumstances a cruel and unusual punishment prohibited by the Eighth Amendment and, in addition, agreeing with the plurality's determination that the Ohio death penalty statute under review "wholly fail[ed] to recognize the unique individuality of every criminal defendant who comes before its courts." 438 U. S., at 621.

the sentencing hearing. Moreover, he was successful in persuading the sentencing tribunal to refuse to permit his standby counsel to present such evidence. By that action, the sentencing court deprived itself of the very evidence that this Court has deemed essential to the determination whether death was the appropriate sentence. We can have no assurance that the death sentence would have been imposed if the sentencing tribunal had engaged in the careful weighing process that was held to be constitutionally required in *Gregg* v. *Georgia* and its progeny. This Court's toleration of the death penalty has depended on its assumption that the penalty will be imposed only after a painstaking review of aggravating and mitigating factors.[5] In this case, that assumption has proved demonstrably false. Instead, the Court has permitted the State's mechanism of execution to be triggered by an entirely arbitrary factor: the defendant's decision to acquiesce in his own death. In my view, the procedure the Court approves today amounts to nothing less than state-administered suicide. I dissent.

---

[5] In addition, my Brethren have considered careful appellate review a requisite to the constitutionality of capital punishment. See, *e. g., Gregg* v. *Georgia,* 428 U. S. 153, 198 (1976). A number of States now have a mandatory appeal procedure for cases in which the death penalty has been imposed. See Ala. Code § 13–11–5 (1977); Ariz. Rule Crim. Proc. 31.2 (b); Cal. Penal Code Ann. § 1239 (b) (West Supp. 1979); Del. Code Ann., Tit. 11, § 4209 (g) (Supp. 1978); Fla. Stat. § 921–141 (4) (1977); Ga. Code § 27–2537 (a) (1978); Idaho Code § 19–2827 (1979); Ill. Rev. Stat., ch. 38, § 9–1 (i) (1977); La. Code Crim. Proc. Ann., Art. 905.9 (West Supp. 1979); Md. Ann. Code, Art. 27, § 414 (Supp. 1978); Neb. Rev. Stat. § 29–2525 (1975); N. H. Rev. Stat. Ann. § 630:5 (VI) (Supp. 1977); Okla. Stat., Tit. 21, § 701.13 (Supp. 1978); 18 Pa. Cons. Stat. § 1311 (h) (1978); S. C. Code § 18–9–20 (1976); Va. Code § 17–110.1 (Supp. 1979); Wyo. Stat. § 6–4–103 (1977).