James Allen **RED DOG**, Defendant Below, Appellant,

v.

**STATE of Delaware**, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted: Feb. 27, 1993.
Decided: Feb. 27, 1993.

Edward C. Pankowski, Jr., Bernard J. O'Donnell and Brian J. Bartley, Asst. Public Defenders, Wilmington, for appellant.

Richard E. Fairbanks, Jr., Chief of Appeals Div., and Steven P. Wood, Deputy Atty. Gen., Wilmington, for appellee.

Before VEASEY, C.J., HORSEY, MOORE, WALSH and HOLLAND, JJ. (constituting the Court en Banc).

HOLLAND, Justice:

This Court has before it an appeal filed at 5:00 p.m. yesterday from the Superior Court's denial of a motion to stay the execution of James Allen Red Dog ("Red Dog"). That execution is set to take place on March 3, 1993 between 10:00 a.m. and 12:30 p.m. On independent and alternative grounds, this Court has concluded that the present appeal is without merit.

The record reflects that the motion for a stay of execution and the present appeal were filed by attorneys from the Public Defender's office without Red Dog's authorization and despite his express oral and written directions to the contrary. In a handwritten note dated February 23, Red Dog stated, "I desire no appeals or any motions for stay of execution, scheduled for March 3, 1993 to be filed on my behalf." When Red Dog learned that a mo-

tion for a stay of execution had been filed in the Superior Court on February 24, he personally advised the Superior Court in writing, on February 25, 1993, that the motion was "against my wishes."

Two related issues are raised by the motion for a stay of execution, which was denied by the Superior Court and is now on appeal before this Court. The first issue, which is substantive, relates to Red Dog's competency. The second issue, which is procedural, relates to the question of standing.

### Red Dog's Competence

The motion for a stay of execution, which was filed with the Superior Court on February 24, 1993, alleged that defense counsel "have a serious concern as to the defendant's present mental competency, and a related concern as to the voluntariness of his alleged waiver of his postconviction rights in this case." That motion was signed by two public defenders, Nancy Jane Perillo and J. Dallas Winslow. Mr. Winslow's signature stated that it was "for" Edward C. Pankowski, the public defender who has been representing Red Dog continuously since February, 1991. An affidavit of Dr. Stephen Mechanick dated February 24, 1993 was filed in support of the motion for a stay of execution.

Mr. Pankowski appeared before the Superior Court to argue the merits of the motion for a stay of execution. Although Mr. Pankowski did not advise the Superior Court that the motion was filed without Mr. Pankowski's consent, the record reflects that Mr. Pankowski does not question and has not, at any relevant time, questioned Red Dog's mental competency. The only question of Red Dog's competency was raised by Ms. Perillo, another public defender, who had visited Red Dog for the first time within the last week.

Prior to the entry of Red Dog's *nolo contendere* pleas and sentencing hearing, Dr. Mechanick had opined that Red Dog was mentally competent. In his recent affidavit, Dr. Mechanick stated that he would be willing to examine Red Dog further. However, according to Dr. Mechanick's affidavit, a determination of Red Dog's present mental competency would require time.

In ruling upon the merits of the motion to stay Red Dog's execution, which were all related to the issue of Red Dog's present mental competency, the Superior Court carefully reviewed the record. In doing so, the Superior Court began by noting that Mr. Pankowski has represented Red Dog since February of 1991, while Ms. Perillo has been in contact with Red Dog only within this past week. The Superior Court also noted that Red Dog's mental competency had never been in dispute.

On March 28, 1991, Mr. Pankowski filed a motion to have Red Dog examined to determine if Red Dog suffered from a mental illness or mental defect and to determine if Red Dog was competent to stand trial. The Superior Court granted the motion. On April 30, 1991, Dr. Kutas Kavlan–Dogan, a forensic psychiatrist at the Delaware State Hospital, examined Red Dog. Based on her examination of Red Dog, in a report to the Superior Court dated July 29, 1991, she found that Red Dog

> was fully oriented; speech was spontaneous, coherent and relevant. He displayed excellent verbal skills and also intellectually came across as being higher than average intelligence.... Insight and judgment appeared intact.

In her report, Dr. Kavlan–Dogan also opined that she "did not find any evidence of any mental illness in the form of either a psychosis or major affective disorder," there was "no evidence in [the] interview of organicity or impairment in cognitive functioning" and "that Mr. Red Dog would not have any problems and would effectively assist his counsel."

Notwithstanding Dr. Kavlan–Dogan's unequivocal determination of Red Dog's mental competency, in early August 1991, the Superior Court *sua sponte* ordered Red Dog to be examined by Dr. Mechanick, a psychiatrist. Dr. Mechanick found that Red Dog's "thought processes showed no disorganization." After the examination, Dr. Mechanick reviewed a number of records that the Superior Court had provided to him. Based on his interview of Red Dog

and the various records, Dr. Mechanick concluded that Red Dog was competent to stand trial.

Dr. Kavlan–Dogan interviewed Red Dog again in late August 1991 and filed a supplemental report. Her conclusions paralleled her earlier findings. Despite the suggestion by others of an anxiety disorder or a bipolar disorder, Dr. Kavlan–Dogan "did not elicit anything that would suggest the presence of either a generalized anxiety disorder or major affective disorder."

Red Dog was also examined in late August 1991 by Dr. S.M. Iqbal, a staff psychologist at the Delaware State Hospital. Magnetic resonance imaging and an electroencephalogram were performed at Dr. Iqbal's request. Those tests revealed no neurological impairment. On the basis of those electronic tests, an interview, and a series of psychological tests, Dr. Iqbal concluded that Red Dog showed no symptoms of mental illness or acute distress.

In considering the merits of the motion for a stay of execution, the Superior Court specifically noted that when Red Dog entered his *nolo contendere* pleas on March 12, 1992, Mr. Pankowski had advised the Superior Court as follows:

> As far as I know, Mr. Red Dog has been examined by numerous psychiatrists, psychologists as part of the pretrial process in normal prosecution. There has been no indication from any of those reports that he's laboring under any mental disability.
>
> I found him to be a very, very intelligent individual with a sufficient amount of schooling and understanding of the criminal justice system in this State and other states to realize his current situation, and he's decided this, for his own personal reasons, is the way he wants to handle this particular matter.
>
> Of all those psychiatric reports and evaluations that were conducted, including some MRI examinations and what they call EEG, examinations consisting of being on the lookout for any mental illness type problems or any organic brain functions, the only thing that was indicated was a slight sinus problem.
>
> So there's absolutely no question here at least from all the experts that looked at Mr. Red Dog that he's laboring under any mental illness or defect.

The Superior Court also noted that it accepted Red Dog's pleas of *nolo contendere* only after an extensive plea colloquy with Red Dog and its finding that those pleas had been offered knowingly, intelligently and voluntarily.

During the penalty hearing, Red Dog's attorney presented evidence in mitigation from Dr. Fred Lahvis, a family practitioner, who was not a psychiatrist, a psychologist, or a neurologist. The Superior Court, though finding that Red Dog had an antisocial personality disorder, explicitly rejected the contention that Red Dog had an organic brain disorder or suffered from a bipolar disorder. According to the Superior Court,

> There was no objective evidence supporting [Dr. Lahvis'] view. While the defendant may have had head injuries in the past, none required hospitalization. Tests for organic brain damage were within normal limits. The doctor's opinions were based on the statements of the defendant given to health care providers, statements which were more often than not contradictory or inconsistent.
>
> The Court also does not believe that sufficient evidence was presented supportive of Bipolar Disorder. At most, on January 16, 1991, Dr. Alan M. Seltzer diagnosed the defendant as suffering from 'Bipolar Disorder, in remission, provisional.'
>
> Dr. Lahvis' conclusions were at odds with the conclusions reached by other health care providers with expertise in psychiatry. In brief, the Court finds that Dr. Lahvis' testimony lacked sufficient foundation for the Court to accept his conclusions. And, even if the Court were to accept his conclusions, the result herein reached would not be different.

This Court specifically noted, during our mandatory review of Red Dog's death sentence, that the Superior Court had considered and rejected Dr. Lahvis' testimony. *See Red Dog v. State*, Del.Supr., 616 A.2d 298, 309 n. 15 (1992).

Following the penalty hearing, the Superior Court sentenced Red Dog to death by lethal injection. Thereafter, Red Dog personally sought to have that sentence imposed and directed his attorney, Mr. Pankowski, not to file a direct appeal. *Red Dog v. State*, Del.Supr., 616 A.2d 298, 300 (1992). Mr. Pankowski adhered to Red Dog's instructions, but did represent him in the mandatory appeal to this Court, which is required by the Delaware Death Penalty Statute. *Id.* 11 *Del.C.* § 4209(g).

In ruling upon the recent motion to stay Red Dog's execution, the Superior Court noted that during the oral argument before this Court on September 29, 1992, Mr. Pankowski stated that there was "no claim concerning [Red Dog's] competence." The Superior Court also noted that as recently as January 26, 1993, a mental health worker with the Correctional Medical Systems reported that Red Dog was "alert, oriented, and in good control with no evidence of any discernible mood or thought disorder or psychosis."

At argument on February 24, 1993, the Superior Court asked Mr. Pankowski how Red Dog appeared on January 29, 1993 when Mr. Pankowski went to the prison to have Red Dog execute his Last Will and Testament. Mr. Pankowski replied that Red Dog was "no different." The Superior Court concluded that "the fact that Mr. Pankowski, a trained lawyer with twenty (20) years of experience, would permit Red Dog to sign his will says much about his view concerning his client's competence." The Superior Court then held:

> Taking into account the opinions of the experts who examined the defendant, Pankowski's assessments, my own perceptions, and the defendant's conduct during the plea colloquy and during the penalty hearing, Red Dog's competency is sufficiently clear as not to raise any question much less a serious question before this Court. On the basis of the objective facts before the State courts, ... no reasonable judge ... could have a substantial doubt about the defendant's competence. The State may, therefore, properly presume that Red Dog remains competent to forego postconviction re-

view of his conviction and sentence, and, in turn, the State may require a substantial threshold showing of incompetence merely to trigger the hearing process....

> Here, the defense attorneys' assertions do not meet that standard. No substantial evidence has been offered. Surely more than a litany of "may's", "could's" and "might's" is necessary before the hearing process will be triggered. (footnote and citations omitted).

■ The Superior Court has made factual determinations that (1) Red Dog's competency has never been an issue and (2) that no substantial evidence of incompetence has been presented, in support of the motion for a stay of execution, to trigger a hearing on the subject of Red Dog's present competency. Moreover, the Superior Court specifically found that, based upon the evidence which had been presented in support of the motion for a stay, no reasonable judge could have a substantial doubt about Red Dog's present mental competence. The parties agree that there is no allegation in this appeal that the Superior Court's decision involved any error of law. The only issues in this appeal are the Superior Court's factual determinations. This Court will not set such a factual finding aside unless it was clearly erroneous.

■ The Superior Court decided not to hold an evidentiary hearing on the question of Red Dog's present mental competency. *Demosthenes v. Baal*, 495 U.S. 731, 736–37, 110 S.Ct. 2223, 2226, 109 L.Ed.2d 762 (1990). The record supports the Superior Court's decision that there was no evidentiary basis presented to support the holding of such a hearing. *Id.* The only basis for any factual allegation of current or recent "incompetency" of Red Dog is the following statement in the motion for stay of execution:

> The Court also gave little weight to defense counsel's recent observation of symptoms in the defendant's thinking and feeling which are consistent with a bipolar and/or organic brain disorder.

At oral argument, Mr. Pankowski, Red Dog's attorney, categorically denied that he has ever contended that Red Dog is or was incompetent. Mr. Pankowski further stated that the quoted statement is only attributable to another member of the Public Defender's office, attorney Ms. Perillo, who first spoke to Red Dog on February 17, 1993, and whom Red Dog does not wish to represent him. Accordingly, the Superior Court's determination that no substantial evidence was presented to warrant holding a hearing on the issue of Red Dog's present mental competency is affirmed.

## Waiver

### Postconviction Relief

■ In this Court, Mr. Pankowski contends that the Superior Court's decision to deny the motion for a stay of execution "is absolutely silent as to the issue of whether there was an intelligent waiver and a hearing on the issue of the waiver of [Red Dog's postconviction] rights." The record does not support Mr. Pankowski's contention. The Superior Court specifically addressed Red Dog's capacity to waive postconviction relief. The Superior Court held that the viability of a challenge to Red Dog's right voluntarily to waive postconviction relief collapsed with its finding that Red Dog is mentally competent at the present time.

The Superior Court concluded that "with no substantial showing that Red Dog lacks the capacity to appreciate his position and to make a rational choice with respect to continuing or abandoning further litigation," it would "respect the rationally-based wishes of the condemned prisoner." citing *Rees v. Peyton,* 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966); *Rumbough v. Procunier,* 753 F.2d 395, 398 (5th Cir.1985); *Wilson v. Lane,* 870 F.2d 1250, 1253 (7th Cir.1989). The Superior Court also concluded that a mental competency hearing is not a necessary prerequisite to allowing a defendant to refrain from pursuing all avenues of postconviction relief available to him. *Autry v. McKaskle,* 727 F.2d 358 (5th Cir.1984). The Superior Court held that

"because there is no substantial showing that Red Dog is currently incompetent and, therefore, incapable of deciding to forego further postconviction remedies, the Motion for Stay of Execution should be ... Denied." We affirm that judgment.

## Standing

### Superior Court

■ In the Superior Court, and in this Court, the State challenged the standing of Red Dog's attorneys to stay his execution. The Superior Court assumed, without deciding, that the public defenders had standing to file the motion for a stay of Red Dog's execution. Nevertheless, the Superior Court carefully recounted its concerns.

The Superior Court noted that Red Dog has consistently chosen to forego any appeals and to be executed. At an office conference on July 25, 1991, Mr. Pankowski recounted his client's position to the Superior Court:

Your Honor, I was assigned to represent Mr. Red Dog shortly after his capture on February 14th. I advised him twice within the week—that week. I have seen him, I'd say, between 12 to 20 times so far. On each occasion he's expressed the desire, because of his career so to speak, that he didn't want to spend any more time in prison, that he would wish to enter a guilty plea and be subject to the penalties of the death penalty in Delaware.... [H]e's expressed all along for various reasons that he doesn't want to spend the rest of his life in jail.

On an early occasion, in fact, his wife came in with a—don't know whether to call him a medicine man—but a minister of some sort from the Sioux tribe in Montana, and told us their plans for him afterlife. So, at least as far as Mr. Red Dog, his wife and whoever the minister was, they have thought all along that he would like to be the subject of the death penalty.

... I see no pattern here of Mr. Red Dog changing his mind. It's been consistent since February 16th, I believe, when

I first met him. So he hasn't changed his mind in numerous contacts.

... He's been consistent all along. This is what he wants the resolution of the case to be.

On July 28, 1992, Red Dog wrote to Mr. Pankowski regarding the automatic appeal to this Court. In that letter, Red Dog advised Mr. Pankowski that he wanted him "to prepare a motion to stop any further appeals or a waiver of any rights to further review. This is in case some group or person files a motion in my behalf to stop the execution once the Delaware Supreme Court issues its 'denial' of the appeal." In a letter dated September 29, 1992, Red Dog wrote to Mr. Pankowski as follows:

As to my letter dated 7/28/92 and my position on the death penalty it has not changed.

If and when a new date is set I will not appeal it. And if an appeal is filed on my behalf I want you to file a motion to stop any further motions for review.

During the December 3, 1992, resentencing, Mr. Pankowski reported to the Superior Court that it continued to be Red Dog's intent to be executed and that the defendant did not plan to contest the sentence.

On February 23, 1993, the day before the motion for stay of execution was heard, Red Dog gave Mr. Pankowski the following handwritten note: "I, James Allen Red Dog, desire no appeals or any motions for stay of execution, scheduled for Mar. 3rd 1993, to be filed on my behalf." On February 25, 1993, Red Dog faxed a letter to the Superior Court stating that the motion to stay was being entertained by the Superior Court against his wishes. In that writing, Red Dog stated that the question of his competency should not be an issue and that the Superior Court should "consider the sheer psychological havoc that is being wrought upon the victim's family, Red Dog and his family by the filing of the motion to stay." On February 25, 1993, Red Dog also submitted the following letter: "I, James Allen Reddog [sic], do not wish any attorney including Nan Perillo to visit me or represent me except Edward Pankowski."

The Superior Court concluded that the record before it reflected unequivocally that Red Dog wanted his execution to proceed on March 3, 1993, as scheduled. The Superior Court also opined that Red Dog's decision to submit to death and forego any challenges cannot, by itself, be deemed aberrational so as to compel a conclusion that he is incompetent. *See Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976); *Hammett v. Texas*, 448 U.S. 725, 100 S.Ct. 2905, 65 L.Ed.2d 1086 (1980) (*per curiam*); *Lenhard v. Wolff*, 444 U.S. 807, 100 S.Ct. 29, 62 L.Ed.2d 20 (1979); *Mitchell v. Lawrence ex rel. Coppola*, 458 U.S. 1123, 103 S.Ct. 21, 73 L.Ed.2d 1394 (1982). In support of that opinion, the Superior Court quoted Chief Justice Rehnquist, who has stated:

The idea that the deliberate decision of one under sentence of death to abandon possible additional legal avenues of attack on that sentence cannot be a rational decision, regardless of its motive, suggests that the preservation of one's own life at whatever costs is the *summmum bonum*, a proposition with respect to which the greatest philosophers and theologians have not agreed and with respect to which the United States Constitution by its terms does not speak.

*Lenhard v. Wolff*, 443 U.S. 1306, 1312–13, 100 S.Ct. 3, 7, 61 L.Ed.2d 885 (1979) (Rehnquist, Circuit Justice).

The Superior Court concluded in Red Dog's case, that the "record is totally bereft of any indication that [the prisoner] in any way to raise further questions concerning his conviction and punishment...." *Lovelace v. Lynaugh*, 809 F.2d 1136, 1137 (5th Cir.1987). Therefore, as an independent basis for affirming the Superior Court's decision to deny the motion for a stay of execution, we hold that in the absence of a genuine issue of material fact as to Red Dog's present mental competency, the public defenders had no standing to file such a motion to stay his execution in derogation of his express directions to the contrary. *Whitmore v. Arkansas*, 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); *Demosthenes v. Baal*, 495 U.S. 731, 110

S.Ct. 2223, 109 L.Ed.2d 762 (1990); *Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976); and *Smith v. Armontrout*, 857 F.2d 1228 (8th Cir.1988).

### Standing in This Court

During oral argument last night, Mr. Pankowski represented to this Court that he had seen Red Dog within the last twenty-four hours. Mr. Pankowski advised this Court that, in his view, Red Dog was competent. Mr. Pankowski also advised this Court that Red Dog had not authorized him to file the present appeal.

This Court directed Mr. Pankowski to confer with Red Dog and to ascertain whether there was any change in Red Dog's prior consistent instructions that Mr. Pankowski take no action to delay the imposition of the death sentence on March 3, 1993. Mr. Pankowski's response was filed in this Court at 11:00 a.m. today and included the following letter from Red Dog.

> James Red Dog
> D.C.C.–Smyrna
> Smyrna, De. 19977
> Feb. 27, 1993

Edward Pankowski Esq.
Public Defenders Office
Wilmington, De. 19805
In re;

To the recent motion filed in my behalf albeit against my wishes, for stay of execution.

Since the Hon. Judge Barron has ruled in my favor and the court will abide by my wishes of denying said appeal for stay. I hereby request and demand that you or the Public Defender's Office no longer pursue this issue of appeal, review or stay of execution. Thereby allowing the scheduled execution to take place on March 3, 1993.

As stated in the letter i faxed to the court on Feb. 25, 1993; any appeals filed at this late date is in retrospect a form of cruel and unusual punishment. An addendum to the sentence the court has already handed down on Dec. 3, 1992.

Any further litigation in regards to an appeal at this time and late date. Serves only to reinforce that such actions by you or others within the Public Defender's Office is strictly in your best interests.

Therefore, I request and demand that as a client the privilege of decision making within the client-attorney relationship be respected.

Also I want it known that I at no time requested Ms. Perillo's services as an attorney. Nor do I want her acting as co-counsel in my behalf.

> Sincerely,
> James A. Red Dog
cc: Edward Pankowski Esq.
James Red Dog

My attorney continues to be Edward Pankowski and I want no other Public Defender to represent me.

> James A. Red Dog
> 2–27–93

The procedural posture of Red Dog's case before this Court is strikingly similar to the facts presented in *Smith v. Armontrout*, 857 F.2d 1228 (8th Cir.1988). In both cases, the defendants were sentenced to death. In both cases, the defendant stated "that the filing of the notice of appeal was unauthorized, that he wants the appeal dismissed, and that he wants the sentence carried out without further review." *Smith v. Armontrout*, 857 F.2d at 1229.

■ If Red Dog is competent, the decision to pursue or dismiss any application for postconviction relief or appeal is his to make. *Id.* The Superior Court has concluded that no scintilla of credible evidence has been presented to suggest that Red Dog's mental condition has changed since the psychiatric examinations were performed which concluded that he was competent. In this opinion, we have affirmed that factual determinations which were made by the Superior Court.

Red Dog, who has been determined to be competent, wants this appeal dismissed. *Id.* Therefore, although we have addressed the merits of the substantive and procedural issues which were presented to the Superior Court, we have serious reservations about whether there is a party be-

fore this Court with standing to challenge the decision of the Superior Court to deny the stay of execution.* *Smith v. Armontrout,* 857 F.2d at 1230.

## *Conclusion*

The judgment of the Superior Court, denying the motion for a stay of Red Dog's execution is AFFIRMED. The mandate shall issue forthwith.

---

* Mr. O'Donnell, one of the three public defenders who signed this notice of appeal, takes the position that notwithstanding Red Dog's desire to dismiss this appeal, the Office of the Public Defender can pursue this appeal as Red Dog's attorney. Mr. O'Donnell asserts that his position is taken as Red Dog's attorney, not as a next-friend, because he believes Red Dog cannot adequately act in his own interest. Rules of Professional Conduct 3.1. Since this Court has affirmed the Superior Court's determination that the factual predicate for Mr. O'Donnell's position does not exist, i.e., Red Dog's present mental incompetency, Mr. O'Donnell apparently lacks standing to act contrary to Red Dog's instructions. *Smith v. Armontrout,* 857 F.2d 1228 (5th Cir.1988). The propriety of having the Public Defender's Office assign multiple attorneys to represent the same person and simultaneously take inconsistent positions will be addressed by this Court at a later time.